ESTES and wife, Respondents, vs. CROSBY and another,
Appellants.

*November 6, 1919—March 9, 1920.*

*Brokers: Real-estate agent: Principal agent liable for misrepre-
sentations of subagent: Misrepresenting lowest amount owner
would accept for lands: Good faith of subagent: Scope of
employment: Authority of subagent.*

1. A real-estate dealer having no binding agreement with an
owner of land sufficient to give him a legal interest therein
was necessarily the agent of the owner in negotiating its
sale.
2. Where a real-estate agent placed land for sale with another
agent, the latter was his subagent, but as to third persons he
was also agent for the owner.
3. A real-estate agent who, in placing land for sale with a sub-
agent, fixed the selling price, and, knowing that the subagent
represented to purchasers that this was the lowest price the
owner would accept, received the benefit of such representa-
tion, was chargeable with the damage to the purchasers from
their reliance thereon.
4. Where the agent fixed the selling price of the land and gave
it to a subagent to be given to possible purchasers, it was
within the scope of the subagent's employment to represent
that this was the lowest price the owner would accept.
5. Where the price so fixed by the principal agent was higher
than that asked by the owner, the fact that the subagent in
good faith represented to purchasers that it was the lowest
the owner would accept does not relieve the principal agent
from the effect of such representations.
6. Where the subagent had reasonable grounds to understand
that the price given him by the principal agent was the
owner's price, and concealed no material fact within his
knowledge from the purchasers, he incurred no liability by
reason of his representation that this was the owner's lowest
price.

APPEALS from a judgment of the circuit court for Oneida
county: A. H. REID, Circuit Judge. *Reversed on appeal
of defendant Crosby; affirmed on appeal of defendant
Hume.*

Both defendants in 1914, and for some time before,
were engaged in the business of dealing in real estate in

Oneida county, defendant *Hume* having his office in the city of Milwaukee and defendant *Crosby* at Rhinelander in Oneida county.

The plaintiffs, husband and wife, were residents of the state of Missouri. *Mrs. Estes* in August, 1914, came to Rhinelander for the purpose of investigating a proposed purchase by them of a farm in Wisconsin. She called upon the defendant *Crosby,* knowing him to be in the real-estate business, and was shown by him certain pieces of property for the sale of which he had or claimed to have the agency, among which was a farm that had been placed for sale through him by defendant *Hume* at the fixed price of $4,000, with an agreement for $200 as a commission in case of a sale. The farm in question at that time was actually owned by one E. S. Shepard.

The transactions between *Hume* and Shepard were oral and in writing.

In July, 1913, Shepard wrote the defendant *Hume,* referring to the farm in question, and saying:

"The 197.95 acres on Lake Julia I told you you could have for $2,000 cash, no com. [understood to mean commission]. This land is actually worth $25 to $35 per acre, but owing to my need of raising money to pay this I have put the price down to almost nothing for the sake of raising immediate cash to pay with."

Three days later he again wrote to defendant *Hume,* referring to a talk with some man who had called on him with reference to the same farm: "I would not tell him the price I gave you. Don't tell any one anything for fear—see?"

*Hume* testifies that subsequent to these letters Shepard orally raised the price to $3,500, then down to $3,250, and finally accepted $3,000 cash.

August 17th plaintiffs wrote to *Crosby:*

"What is the best terms possible to get on the place? As I told you, we can now pay $1,000 down and more as soon as we sell, which we hope to do soon, but of course we cannot

tell. ⋅ If we could pay the $1,000 down and let the balance run indefinitely at six per cent. or until we can sell (which we hope to do soon), we will then turn the money in on the place or hope to make some next year if enough can be broke to farm. . . . I want to decide on some place, so please answer this the same day you receive my letter. . . . Please write just what you think we could do on same. . . ."

*Crosby* to plaintiffs August 19th:

"The piece in question belongs to a gentleman in Milwaukee who wanted me to sell it and he told me to sell it for $4,000 on any reasonable terms.   I think he would be satisfied with $1,000 cash down. . . ."

Letter of August 26th, *Crosby* to plaintiffs:

"Dear Sir:   *Mr. Hume* of Milwaukee was in the office this morning and talked with me about that Shepard farm. I supposed all the time that he owned that, because he bought a tract of land from Shepard and he gave me a list of this farm for me to sell, but it seems that he does not own it and that Shepard still owns it, and has about decided not to sell, but he told *Mr. Hume* that he would sell it for $4,000 provided it is all cash, and the sale must be made this week or early next.   *Mr. Hume* says that he is going back to Milwaukee Friday and if he can find anybody who will take a mortgage for $3,000 on the place, he will wire me and we will close the deal up at once, but I don't want to take your $1,000 and pay on the land until I know that he can get somebody to handle the $3,000. . . ."

In September plaintiffs purchased the farm by paying $1,000 cash and giving a note for $3,000 secured by mortgage.   They moved there in October and have lived there since.

The deed from Shepard was made directly to the plaintiffs and was sent to them by *Crosby,* after he had received the $1,000 and the mortgage, in a letter of September 18th saying:

"Dear Madam: I just returned from the state fair, and the deed being all recorded, am inclosing it herewith.   The deed was made from Shepard direct to you to save transfer

through *Mr. Hume,* and *Mr. Hume* had a trade with him on some other property, so made the deed run, 'Consideration $3,250 and other valuable considerations.' So you will understand why that sum is mentioned in the way that it is. . . ."

August 6, 1914, *Hume* had written *Crosby* saying:

"This was given to me as a 200-acre tract, and my price on it, as I telephoned you, was $4,000, and we would have to get this price even if the acreage should fall short."

September 1st, after *Hume* had been notified of the progress of the deal between *Crosby* and plaintiffs, he writes *Crosby* as follows:

". . . I was not able to see my party regarding the Lake Julia land until noon today, but am in shape to carry through the proposition providing I can get the property from Shepard as I talked to you. Shepard wants all cash and will consider nothing less. I am prepared to pay it to him, providing the deal that you have on hand goes through. If you will have your party deposit $1,000 in your bank at Rhinelander, payable to," etc.; "also have her execute a mortgage of $3,000 payable to," etc.; "on advice from you that the money has been deposited, I would immediately go up and close the deal with Shepard. In handling this matter on your part, I would not mention to anybody that you have anything to do with Shepard, for the reason that I stated to you."

On September 12th he again writes *Crosby:*

"I called up Shepard on the phone and I find that the matter is still open, so I secured money and will be up there on Monday morning to conclude deal, provided Shepard does not change his mind."

The following testimony was given by *Mr. Hume* on the trial:

"*Q.* Did you have anything in writing or anything that was binding between Mr. Shepard until that date when you went to his place of business or to his home with money in your pocket to buy? *A.* Nothing. The question came up, and I said, 'Now, Gene, you better give me a writing,'

Estes v. Crosby, 171 Wis. 73.

and he said, 'No, we have dealt enough and my word will be all right. You get around here and we will clean it up.'"

Shepard testified that he was paid only $2,750 for the property; that *Hume* claimed to have a partner in the deal with whom he must share a $500 commission.

After plaintiffs learned that considerably less than $4,000 had been paid to the owner, Shepard, on the farm they brought this action against the two defendants to recover the difference between the amount so paid and the $4,000.

A special verdict was submitted to the jury, which with the answers thereto was as follows:

"(1) Did the statements orally and by letter which were made by defendant *Crosby* to the plaintiffs, naturally and reasonably convey to the plaintiffs the understanding that $4,000 was Shepard's lowest price for the land in question? *A.* Yes.

"(2) If you answer the first question 'Yes,' then did the plaintiffs pay $4,000 for the land in question by reason of such understanding? *A.* Yes.

"(3) If you answer the second question 'Yes,' then were the plaintiffs justified in relying upon the representations of the defendant *Crosby* in respect to Shepard's price? *A.* Yes.

"(4) Did the defendant *Hume* give the defendant *Crosby* reasonable grounds to understand, before the sale was made to the plaintiffs, that Shepard's price for the land was $4,000, out of which a commission was to be paid? *A.* Yes.

"(5) If you answer the first three questions 'Yes,' then what damages did the plaintiffs suffer by reason of the misrepresentations therein referred to? *A.* $875."

Upon the fourth question the court charged the jury as follows:

"You will note that it relates to Shepard's price and to a time before the sale was made to the plaintiffs. Did the defendant *Hume,* by his conversation and correspondence with *Crosby,* give *Crosby* reasonable ground to understand that Shepard's price was $4,000, out of which he would pay a commission?

"If the evidence satisfies the jury to a reasonable certainty that this question should be answered affirmatively, then you will so answer it.  Otherwise you should answer it 'No.' "

After the verdict the two defendants made separate motions for judgment in their favor, or, in default thereof, for other relief, which were severally denied and plaintiffs' motion for judgment upon the verdict granted, and thereupon judgment entered for the amount of damages as found by the jury, together with interest and costs, and from the judgment so entered the two defendants have severally appealed.

The cause was submitted for the appellant *Crosby* on the brief of *Charles F. Smith, Jr.,* of Rhinelander; for the appellant *Hume* on that of *E. D. Minahan* of Rhinelander; and for the respondents on that of *J. & M. Van Hecke* of Merrill.

The following opinion was filed January 13, 1920:

ESCHWEILER, J.    The appellant *Hume* assigns as error: (1) that there is no evidence to warrant the instruction to the jury given by the court to the effect that he, *Hume,* was the agent of the owner, Shepard; (2) or that *Crosby* was such agent; (3) that there is no cause of action shown as against him, *Hume;* (4) that the representation made by *Crosby* that the bottom price of this property was $4,000 was not within the scope of *Crosby's* employment; (5) that there is no ground for liability against the agent *Crosby* and therefore there can be none predicated against *Hume;* and lastly, (6) that there is no evidence to support the finding of the jury to the fourth question of the special verdict.

However much *Mr. Hume* may have felt justified, from his manner of dealing with Mr. Shepard and possibly from more or less of a custom among people engaged in that line of business, in proceeding to deal with this farm as though he were the owner and therefore fixing such price upon it

as he pleased and lawfully might, it nevertheless appears from the correspondence and testimony given above, there being no writing sufficient to meet the requirement of the statute, that there was at no time any binding agreement in law between them sufficient to give *Hume* an interest in the real estate. · When the time came for the conclusion of the transaction with the plaintiffs *Hume* evidently did not consider that any prior negotiations between himself and Shepard were ·complete or binding before he offered to Shepard the cash to meet the latter's then terms. This was after the plaintiffs had paid their $1,000 to *Crosby* and he in turn sent that sum to *Hume*.

In offering this property for sale as he did, *Hume* could only act on his own behalf in case he had such a legal interest as would warrant such a course; if he did not possess such interest he was in law an agent of Shepard, the real owner. Not having placed himself in the first position, the legal consequences of his acts necessarily placed him in the second. The trial court was therefore correct in his charge to the jury in summarizing the situation by saying that *Hume* was the agent of Shepard. As between Shepard and *Crosby,* the latter was therefore a subagent of the former, conceding *Hume's* right to employ such a subagent.

The contention on the third point, to the effect that there is no cause of action against *Hume,* also cannot be sustained.

Although *Crosby* was subagent for Shepard he was also at the same time agent for the defendant *Hume* in this transaction with the plaintiffs. As such agent for *Hume* he represented to the plaintiffs that the lowest price for this property was $4,000. *Hume* fixed that price himself, and, knowing that it was being made by *Crosby* to the plaintiffs, received the benefit of such representation. Having profited thereby, he, as principal for his agent, *Crosby,* must be held chargeable with the damage done to the plaintiffs by their relying upon and acting on such representation. *First Nat. Bank v. Hackett,* 159 Wis. 113, 119, 149 N. W. 703.

There is support for the finding of the jury that the plaintiffs relied upon this representation that $4,000 was the lowest purchase price from the evidence of the plaintiffs as well as by the assumption, in which a jury may properly indulge, that in the usual course of human affairs purchasers do not pay the higher in preference to a possible lesser price.

On the fourth point the evidence warrants the conclusion that, in making the representation to the plaintiffs as to the price being the lowest, *Crosby* was acting within the scope of his employment. *Hume* fixed this price, gave it to *Crosby* to be given to possible purchasers, and it was therefore strictly within the scope of the employment to so represent it.

The question argued in the fifth proposition as to whether or not there was a liability against *Crosby* is immaterial so far as defendant *Hume* is concerned. His liability is predicated upon that which was done on his behalf by *Crosby*, who acted only as agent for him and from whose acts as subagent *Hume* reaped the benefit. *Hume* alone was the moving cause for this error of fact which resulted in damage to plaintiffs, therefore he alone must assume the consequent liability.

The finding of the jury embodied in their answer to the fourth question of the special verdict, that *Crosby* had reasonable grounds to believe that the bottom price for this property was $4,000, is supported by the correspondence between the two defendants and the testimony. *Crosby* dealt with *Hume* alone, and not with Shepard. It was *Hume* who fixed the price, and he confirmed what *Crosby* had done in regard to the same by accepting the result.

On the appeal of defendant *Crosby* we deem it necessary to discuss but one of the several points urged by him.

Being satisfied, as we have above indicated, that the jury were warranted in arriving at the conclusion that *Crosby* had reasonable grounds, based upon his transactions with

the defendant *Hume*, to understand that the price of this property was $4,000 to Mr. Shepard less a commission, this in effect determined that *Crosby* acted in good faith in this transaction, and necessarily, also, that he used reasonable diligence in ascertaining as to the fact before representing the same. Being acquitted, therefore, by this finding of any lack of either good faith or reasonable care, there is no basis upon which he can be held personally liable. He concealed no material fact within his knowledge; he discloses in the letter of August 26th, *supra,* that he is merely conveying from *Hume* to plaintiffs the statement as to Shepard's selling price being $4,000, and he did not fail in the exercise of the ordinary care required of an agent in such a situation. He therefore breached no duty that he owed, if any, to the plaintiffs and incurred no liability. While a principal may be liable for the mistake of the agent, it does not follow that an agent, having acted in good faith and with reasonable care, is liable for the mistake of his principal.

It follows that the trial court was right in awarding judgment against the defendant *Hume,* but erred in denying the motion of the defendant *Crosby* for judgment in his favor.

*By the Court.*—The judgment is so modified as to discharge the defendant *Crosby* from any liability thereunder, and it is allowed to stand as against the defendant *Hume.* Appellant *Crosby* to have his costs on this appeal as against the plaintiffs, the plaintiffs to have theirs as against the defendant *Hume.*

The appellant *Hume* moved for a rehearing.

In support of the motion there was a brief by *E. D. Minahan* of Rhinelander, attorney for the appellant *Hume.*

In opposition thereto there was a brief by *Charles F. Smith, Jr.,* of Rhinelander, attorney for the appellant *Crosby,* and a brief by *J. & M. Van Hecke* of Merrill, attorneys for the respondents.

The motion was denied, with $25 costs, on March 9, 1920.

On April 5, 1920, a motion was filed by the appellant *Crosby* for an order amending the mandate.   The following opinion was filed May 5, 1920:

PER CURIAM.   The decision and mandate of this court on the appeal in this case determined that the defendant *Crosby* was entitled to a judgment in the court below of dismissal of the action as against him.   Upon such a judgment in the circuit court he would be entitled to costs in his favor as against the plaintiff as a matter of course.   For this reason we do not deem it necessary to change the mandate, and the motion to amend it is therefore denied without costs.